ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | |
|---|---|
| IN RE: PROFEMUR HIP IMPLANT PRODUCTS LIABILITY LITIGATION | MDL NO. 2949 4:20-MD-2949-KGB |
| KIM POPOWICZ, and VICTOR POPOWICZ, | |
| **Plaintiffs,** | THIS DOCUMENT RELATES TO: |
| v. | Civil Action No.: 4:23cv-210-KGB |
| **WRIGHT MEDICAL TECHNOLOGY, INC.,** a Delaware corporation; and **MICROPORT ORTHOPEDICS, INC.,** a Delaware corporation. | |
| | JURY TRIAL DEMANDED |
| **Defendants.** | |

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 2 0 2023

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

## COMPLAINT

COMES NOW Plaintiff, Kim Popowicz ("Plaintiff"), and her husband Plaintiff Victor Popowicz by and through their undersigned attorneys, and file this this Complaint for damages against Defendants, Wright Medical Technology, Inc., a Delaware corporation; and MicroPort Orthopedics, Inc., a Delaware corporation, and allege the following causes of action against Defendants, and each of them, as follows:

This case assigned to District Judge Baker
and to Magistrate Judge Harris

## NATURE OF THE ACTION

1.     Plaintiff was implanted with the PROFEMUR® Total Hip System including the PROFEMUR® Z Stem ("Stem"), and PROFEMUR® Plus Neck ("modular neck") (collectively "the PROFEMUR® Total Hip System" or "the Device".

2.     Plaintiff underwent a right-sided total hip arthroplasty where the Profemur Total Hip System was implanted on June 1, 2020.

3.     The Profemur Total Hip System has failed due to corrosion related adverse tissue reaction and the head and neck components have been surgically removed and replaced.

4.     Defendants have long known that their Profemur Total Hip System design has an unacceptable tendency to fret and corrode at the location of the modular neck-stem-body junction during even low to moderate physical activity. Defendants have known for years that their Profemur Total Hip System was prone to fail within a few years of implantation causing severe debilitating tissue destruction. Significantly, consequent to reports of fretting corrosion and fracture at the stem and modular neck junction, Defendant MicroPort issued a recall and ceased marketing the Device. As a result of the Device's defects and Defendants' tortious acts/omissions, Plaintiff, and many other patients who received these devices, endured unnecessary pain and suffering; debilitating lack of mobility; and a

subsequent more difficult revision surgery to replace the defective Device, giving rise to more pain and suffering, prolonged recovery time, and increased risk of complications and death from surgery.

5.    This is an action for products liability under the Florida Liability Statutes (Sec. 768.81(1)(d)) for strict liability design and warning defects and negligence; fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation; and punitive damages brought by Plaintiff Kim Popowicz for injuries arising out of the failure of her implanted PROFEMUR® Total Hip System. Further, Plaintiff Victor Popowicz brings a claim for loss of consortium

## **PARTIES**

6.    Plaintiff Kim Popowicz and her husband Victor Popowicz are residents of Mims, Brevard County, State of Florida.  Plaintiff underwent a right total hip arthroplasty surgery performed by Ramy Hannah, M.D. at Parrish Medical Center, Titusville, Florida, on June 1, 2020. During this surgery, the PROFEMUR® Total Hip System designed, manufactured, distributed, labeled, marketed, sold, and warranted by Defendants was implanted into Plaintiff.  Plaintiff's surgeon, medical staff, and other healthcare providers met or exceeded the standard of care applicable to the hip replacement surgery.

7.    The Profemur Total Hip System implanted in Plaintiff failed and necessitated a right-sided revision of the femoral head and neck, performed by

3

George Haidukewych, M.D. at OH Orlando Medical Center, Orlando, Florida, on November 9, 2021. During this surgery, a femoral head and modular neck designed, manufactured, distributed, labeled, marketed, sold, and warranted by Defendants were implanted into Plaintiff. Plaintiff's surgeon, medical staff and other healthcare providers met or exceeded the standard of care applicable to the partial revision surgery.

8.    Defendant Wright Medical Technology, Inc. ("WMT," "Wright," or "Wright Medical") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Memphis, Tennessee, and as such is a citizen of both the State of Tennessee and the State of Delaware. Defendant WMT is registered to do business in the State of Florida and may be served with process by serving its registered agent for service, C T Corporation System, at 1200 South Pine Island Road, Plantation, Florida 38117.  At all times relevant hereto, Defendant WMT conducted regular and sustained business in the State of Florida by selling and distributing its products in Florida and engaged in substantial commerce and business activity in the County of Brevard.

9.    Defendant MicroPort Orthopedics, Inc. ("MicroPort") is a corporation organized under the laws of the State of Delaware, with its headquarters and principal place of business located in Arlington, Tennessee, and as such is a citizen of the State of Tennessee and the State of Delaware.  Defendant MicroPort is

registered to do business in the State of Florida and may be served with process by

serving its registered agent for service, C T Corporation System, at 1200 South Pine

Island Road, Plantation, Florida 38117.  At all times relevant hereto, Defendant

MicroPort conducted regular and substantial business in the State of Florida by

selling and distributing its products in Florida and engaged in substantial commerce

and business activity in the County of Brevard.

## JURISDICTION & VENUE

10.    This Court has diversity jurisdiction pursuant to 28 U.S. C. §1332. The

amount in controversy exceeds the sum of Seventy-Five Thousand Dollars

($75,000), exclusive of interest and cost, as this action involves a products liability

claim by a severely injured party. There is complete diversity of citizenship between

the parties.

11.    As material events that give rise to this action took place in the Middle

District of Florida, Orlando Division, and as Defendants did and continue to do

business within the State of Florida and have continuous and systematic contacts

with the State of Florida and have consented to jurisdiction in the State of Florida,

venue is proper in the Middle District of Florida, Orlando Division pursuant to 28

U.S.C. §1391. Defendants are corporations and deemed to reside in a judicial district

in which they are subject to personal jurisdiction.   28 U.S.C. §1391(c).   As

Defendants are subject to personal jurisdiction in Florida, and a substantial part of

the events giving rise to this claim occurred in the Middle District of Florida, Orlando Division venue is proper in that Court.  28 U.S.C. §1391(a)(1).

12.    At all times relevant hereto, Defendants developed, manufactured, advertised, promoted, marketed, sold and/or distributed the defective Profemur® Total Hip System, including the Profemur® (cobalt chromium) neck and (titanium) femoral stem components, throughout the United States, including Florida.

13.    But for this Court's Case Management Order Number 1, entered on March 11, 2021, allowing for direct filing in the MDL Court, Plaintiff would have filed in the United States District Court for the Middle District of Florida, Orlando Division.

## FACTUAL ALLEGATIONS

14.    PROFEMUR® modular necks were first marketed by Cremascoli Ortho ("Cremascoli"), a European medical device manufacturer in 1986.

15.    Since 1985, Defendant, Wright, directly or through its parent corporation, subsidiaries or affiliates, Wright Medical Group, Inc., Wright Medical Europe, S.A., Cremascoli Ortho, Wright Cremascoli Ortho, and others designed, manufactured, labeled, marketed, promoted, distributed and sold in the United States artificial hips with modular components.

16.     In December 1999, Wright acquired Cremascoli, its product lines, documents, and manufacturing facilities, including the Profemur® line of hip products.

17.     After the acquisition of Cremascoli, Wright re-designed the Profemur® modular artificial hip stem and modular neck, expanded the product line to include additional titanium models or versions of Profemur® stems and Profemur® modular necks, and rebranded the Cremascoli titanium modular neck product line, and compatible titanium artificial hip stems, as the Wright Profemur® Total Hip System.

18.     By way of what is known as Section 510(k) premarket notification process, on December 13, 2000, Wright received clearance from the U.S. Food and Drug Administration (FDA) to distribute in the United States its first titanium modular neck and stem artificial hips.

19.     The FDA never approved the safety or effectiveness of Wright's newly rebranded hip implant system and product line of modular necks, but instead merely accepted Wright's assertion that the Profemur® Hip System was substantially equivalent to an already legally marketed device (i.e., the Cremascoli modular neck component acquired by Wright in December 1999).

20.     The 510(k) clearance process is distinct from the FDA pre-market approval (PMA) process in that clearance does not require clinical confirmation of

safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

21.    Sometime after December 13, 2000, Wright began to manufacture, label, market, promote, distribute and sell in the United States the hip implant devices branded as "Profemur® Total Hip System" under the 510(k) clearance, which included titanium stems and titanium modular necks.

22.    The Wright Medical Profemur® modular necks that were distributed by Wright after December 13, 2000, and before August 25, 2009, were all made of the titanium-aluminum-vanadium alloy known as Ti6Al4V.

23.    In the year 2000 and in all years thereafter to the present, Ti6Al4V was an alloy generally available for use in manufacturing implantable medical devices.

24.    In the year 2000 and in all years thereafter to the present, monoblock hip implant stems without modular neck-stem junctions were readily available in the market.

25.    In various marketing and promotional material published and distributed by Wright from approximately the year 2002, and into the year 2005, and available to Wright's sales representatives and distributors, surgeons, patients and the general public, Wright made the following representations, statements, claims and guarantees about its Profemur® modular necks:

> The modular neck used with the Profemur® hip has been employed by Wright Cremascoli for over fifteen years.  The necks were designed in

8

1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures. The necks are used in other Wright Cremascoli hip systems besides the Profemur® hip. <u>None of the necks has experienced a clinical failure since their inception</u> [emphasis added].

and

The modular neck system, designed by Cremascoli in 1985 (U.S. Patent No. 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty. Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant <u>guarantees</u>:

- Structural reliability
- <u>Absence of significant micromovement</u>
- <u>Absence of fretting corrosion</u>

[emphasis added].

[Wright Medical Technology Monograph MH688-102© 2004].

26.    On or about April 19, 2005, Wright first reported to the FDA a Profemur® modular neck clinical failure where a Ti6Al4V modular neck implanted in a patient experienced a catastrophic fracture (i.e., breaking into two pieces) due to fretting and corrosion at the oblong tapered distal end where the neck is seated in the stem.

27.    After receiving notice of the first modular neck fracture, Wright received notice of additional modular neck clinical failures from corrosion-based fractures of the modular necks.

28.    The number of Profemur® Ti6Al4V modular neck clinical corrosion-based fractures has continued to increase over time, and continues to increase to the present day, now numbering more than 800 such clinical failures.

29.    As the number of reported Wright Ti6Al4V modular neck fractures continued to increase and the FDA became aware of its dismal clinical performance, case studies appeared in medical journals reporting the fracture of Wright titanium Profemur® modular necks and identifying micromotion and fretting corrosion at the neck-stem junction as the cause and mode of failure.

30.    At some point in time prior to August 25, 2009, Wright had notice that a higher than normal rate of early failure of its Profemur® line of hip implant devices were failing by fracture at the modular neck junction secondary to micromotion, fretting and corrosion.

31.    As the number of reported Wright Ti6Al4V Profemur® modular neck fractures continued to increase, Wright, rather than redesigning its hip implant system to eliminate the modular neck-stem junction and thereby eliminate micromotion, and fretting corrosion, instead began to design and develop a Profemur® modular neck made of a cobalt chrome (CoCr) metal alloy utilizing the same taper design as the titanium modular necks and the same Profemur® stems.

32.    On April 16, 2009, Wright submitted a Section 510(k) premarket notification of intent to market a device generally identified as Profemur® hip system

modular necks made of a cobalt chrome alloy to the FDA to be coupled with existing Profemur® stems.

33.    On or about August 25, 2009, Wright began to market and offer for distribution and sale in the United States Profemur® modular necks made of cobalt chromium alloy, and Wright simultaneously began withdrawing from the market its Profemur® modular necks comprised of Ti6Al4V titanium alloy.

34.    Wright could have eliminated the potential for fretting and corrosion at the modular neck junction of its Profemur® hip implants by redesigning and/or abandoning modularity and manufacturing, designing, and marketing monoblock stems, but it chose not to do so because Wright did not want to lose its investment in the market share for the use of its modular stems in primary hip implant arthroplasties.

35.    In promoting its Profemur® CoCr modular necks, Wright claimed that the cobalt chrome modular necks would result in less fretting than occurred with Ti6Al4V modular necks.

36.    The design of the Profemur® CoCr modular neck, when coupled with the design of the titanium Profemur® hip stems, is such that it in fact promotes the process of fretting corrosion of more harmful metal particles at the modular neck-stem junction.

11

37.    The Profemur® CoCr modular necks that Wright designed and manufactured were designed to be used with most, if not all, of the same femoral heads and most, if not all, of the same Profemur® titanium hip Stems as were its titanium (Ti6Al4V) Profemur® modular necks.

38.    While promoting its Profemur® CoCr modular necks Wright Medical stated, "[p]roduct complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® CoCr modular necks." [See Profemur® CoCr Modular Necks Frequently Asked Questions, Wright Medical publication MH 1619-812.]

39.    Wright's statement in its promotional materials that "[p]roduct complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® CoCr modular necks," was not supported by unbiased sound scientific testing.

40.    The claim by Wright that "[p]roduct complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® CoCr modular necks" was false and/or misleading.

12

41.    While promoting its Profemur® CoCr modular necks, Wright claimed that its CoCr modular necks would result in less fretting than occurred with titanium modular necks.

42.    Claims by Wright that its CoCr modular necks would result in less fretting than occurred with titanium (Ti6Al4V) modular necks were not supported by unbiased, sound scientific testing.

43.    Claims by Wright that its CoCr modular necks would result in less fretting than occurred with titanium (Ti6Al4V) modular necks were false and/or misleading.

44.    The design of the Profemur® CoCr modular neck, when coupled with the design of the titanium (Ti6Al4V) Profemur® hip stems, is such that it in fact encourages the process of fretting corrosion at the modular neck-stem junction.

45.    Prior to offering its Profemur® CoCr modular necks for distribution or sale in the United States, neither Wright nor MicroPort adequately tested the design of CoCr Profemur® modular necks for fretting corrosion or the biological effects of cobalt and chromium corrosion, metal debris and metal ions on the body of patients.

46.    Prior to offering its Profemur® CoCr modular necks for distribution or sale in the United States, neither Wright nor MicroPort adequately tested the design of the CoCr Profemur® modular necks for corrosion or the biological effect of corrosion on the body after implantation in patients.

13

47.    Wright rushed the Profemur® CoCr modular necks to market without adequately testing it for in vivo performance, including, but not limited to, resistance to fretting and corrosion or the effects of corrosion on human tissue.

48.    Wright rushed the Profemur® CoCr modular necks to market in order to preserve market share and its profits from the sale of its failing Profemur® hip implant products.

49.    Years before Plaintiff was implanted with the Device, Wright had been informed that the Profemur® CoCr modular necks were corroding in patients to the extent that revision surgeries were necessary to remove the Profemur® CoCr modular necks.

50.    In January of 2014, Wright sold the OrthoRecon Division, Wright's operating unit for the manufacture and sale of Wright's hip and knee implants, to MicroPort.

51.    MicroPort and Wright knew or should have known that as of June 1, 2020, the date Plaintiff received her Wright Profemur® Total Hip implant that:

(a)    Wright and MicroPort had not adequately tested the Profemur® modular necks to simulate in vivo performance for resistance to fretting corrosion;

(b)    MicroPort had not adequately tested the Profemur® Total Hip System;

14

(c)     Wright and MicroPort had not adequately tested the Profemur®
CoCr modular necks to simulate in vivo performance for resistance to
corrosion;

(d)     The Profemur® CoCr modular necks would be subject to fretting
corrosion;

(e)     There was an increased risk of fretting corrosion at the neck-stem
junction;

(f)     There was an increased risk of corrosion at the neck-stem
junction; and

(g)     There was a substantial risk that patients' bodies would be
adversely affected by the exposure to corrosion, metal debris and metal ions
secondary to cobalt and chromium fretting and corrosion and that patients
would require revision surgery.

52.     The Neck-Stem junctions of the Profemur® CoCr modular neck,
coupled with a Profemur® titanium hip stem, are subject to significant movement
which results in fretting corrosion, pitting corrosion, metal debris cast off and metal
ion release.

53.     Product complaint data reported to Wright and MicroPort prior to June
2020  indicated an increased risk of  adverse events due to tissue exposure to metal
debris and ion cast off from taper junction fretting and corrosion of the Profemur®

CoCr modular necks when coupled with Profemur® titanium hip stems, as compared to traditional titanium necks or monoblock stems.

54.    Product complaint data reported to Wright and MicroPort prior to June 2020 indicated an increased risk of adverse events due to corrosion, as compared to traditional monoblock stems or titanium necks when coupled with the Profemur® hip stems.

55.    Based upon what Wright and MicroPort knew or should have known before June 1, 2020, Wright and MicroPort should have informed orthopedic surgeons using the Profemur® Total Hip Systems that there was an increased risk of fretting and corrosion for Profemur® CoCr modular necks when coupled with Profemur® titanium hip stems.

56.    The Profemur® CoCr modular neck, Profemur® titanium modular stem and the Profemur® Total Hip System are defective and unreasonably dangerous because of their design defects in that the harmful characteristics or consequences inherent in the product's use for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing the defective product in the body of Plaintiff. Furthermore, the said devices were defective and unreasonably dangerous in that they failed to perform as an ordinary consumer would expect when they were used in a reasonably foreseeable manner.

57.     Additionally, the Profemur® CoCr modular neck, Profemur® titanium modular stem and the Profemur® Total Hip System implanted in Plaintiff were defective in manufacture, as Wright manufactured same such that the tolerances between the stem and neck components did not comply with Wright's design specifications.

58.     Based upon the facts and allegations set forth above, the Profemur® CoCr modular neck, Profemur® titanium stem, and the Profemur® Total Hip System are defective and unreasonably dangerous in labeling in that they do not provide adequate warnings of the dangers or information of said risks when the device is used in a reasonably foreseeable manner.

59.     Based upon the facts and allegations set forth above, the Profemur® CoCr modular necks, Profemur® titanium modular stem, and the Profemur® Total Hip System are defective and unreasonably dangerous in that the risks that were inherent in the product being used for hip replacement, when weighed against the alleged utility or benefit derived from the product's use, outweigh the benefit.

60.     Defendants WMT and MicroPort were negligent and/or strictly liable in design, manufacture, distribution, sale, marketing, promotion, and labeling of the Profemur® CoCr modular neck, Profemur® titanium modular stem, and the Profemur® Total Hip System.

61.     Defendants were negligent and/or strictly liable in the failure to warn patients and/or surgeons that it had received product complaint data that indicated an increased risk of adverse events due to taper junction fretting and cobalt chromium corrosion, as compared to other available safe alternative devices.

62.     Defendants were negligent and/or strictly liable in failing to warn patients and surgeons that they had received product complaint data that indicated an increased risk of adverse events due to corrosion, as compared to other available safe alternative devices.

## PLAINTIFF KIM POPOWICZ'S PROFEMUR® HIP AND RELATED INJURIES AND DAMAGES

63.     On or about June 1, 2020, Plaintiff had a Profemur® Total Hip System implanted in her right hip ("Index Surgery") in a procedure known as a total hip arthroplasty (or "THA").

64.     Orthopedic surgeon Dr. Hannah performed the right Index Surgery during which he implanted the Profemur® Total Hip System in Plaintiff.   The implants used include: a 56-mm Dynasty PC shell; Wright Medical Profemur Plus modular neck short/straight[PHAC-1242]; Wright Medical A Class femoral metal head, 40-mm diameter; and Wright Medical Profemur Z stem, size 9 [PHA00248].

65.    Plaintiff's Index Surgery was performed at Parrish Medical Center, Titusville, Florida.

66.    Dr. Hannah did not breach any generally accepted standard of care in the field of orthopedic surgery in his care and treatment of Plaintiff or negligently cause any injury to Plaintiff in any of the following respects:

(a)    In the care or treatment that he provided prior to the hip implant surgery;

(b)    In the hip implant surgery he performed; or

(c)    In the care or treatment that he provided subsequent to Plaintiff's hip implant surgery.

67.    Based upon the patient population that Wright and MicroPort intended the Device to be implanted in, at the time of Plaintiff's Index Surgery, she was an appropriate patient to be implanted with the Profemur® Total Hip System.

68.    Dr. Hannah recommended the Profemur Total Hip System to Plaintiff and indicated that the Device was appropriate for her.

69.    Plaintiff reasonably relied upon Dr. Hannah in deciding to proceed with hip replacement surgery and have the Profemur® Total Hip System implanted.

70.    On or about November 9, 2021, Plaintiff reported to Dr. Haidukewych, OH Orlando Reginal Medical Center, Orlando, Florida, for revision/replacement of the femoral head and neck.  Dr. Haidukewych recommended the revision surgery

after Plaintiff presented with pain and weakness, adverse local tissue reaction and elevated Cobalt levels.. Dr. Haidukewych implanted a MicroPort modular neck [PHAO1242]; and a MicroPort cobalt chrome femoral head, [PHAO4426].

71.    Before or during the course of Plaintiff's Index and Revision Surgeries, Defendants MicroPort and/or Wright arranged for the Profemur® Total Hip System, including all Profemur components, that was implanted in Plaintiff to be delivered to the hospital and/or Plaintiff's surgeons for implantation in Plaintiff.

72.    Defendants, directly or through their subsidiaries or affiliates, designed, manufactured, distributed, marketed, delivered and sold in the United States various prosthetic orthopedic devices, including the Profemur® Total Hip System, including all Profemur components implanted in Plaintiff during the Index and Revision Surgeries.

73.    At Plaintiff's Index and Revision Surgeries, the Profemur® Total Hip System, including all Profemur components, was in substantially the same condition in all relevant respects as when it left Defendants' control.

74.    At all times relevant hereto, Plaintiff used the implanted Profemur® Total Hip System in a normal and reasonably foreseeable manner.

75.    On or about November 9, 2021, the Profemur® Total Hip System implanted in Plaintiff was discovered to have failed as a direct and proximate result

20

of the actions, conduct, negligence, and breach of duties of the Defendants, as alleged in this Complaint.

76.     The Profemur® Total Hip System (and its components), implanted in Plaintiff was not merchantable, but was defective and unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

(a)     it was and is defective and unreasonably dangerous under Florida's product liability law because of one or more or a combination of the following:

(i)     the neck was manufactured/designed in such a manner as to be subjected to excessive micromotion, fretting and corrosion, thereby increasing the potential for injury and failure;

(ii)    the surface of the section of the neck that was inserted into the modular stem was manufactured/designed in such a manner as to increase the potential for fretting and corrosion, thereby increasing the potential for injury and failure;

(iii)   the portion of the neck that was inserted into the modular stem was in a narrow, confined space, thereby increasing the potential for fretting, corrosion, injury and failure;

(iv)    the device's components were manufactured/designed in such a way as to make the modular neck component susceptible to

micromotion, fretting and corrosion, thereby increasing the potential for injury and failure;

(v)    the device's components were manufactured/designed in such a way as to cause dissimilar metals (i.e., a CoCr modular neck and titanium modular stem) to mate by insertion into a narrow, confined space, thereby increasing the potential for corrosion; and

(vi)    there may be other conditions or defects yet to be determined.

(b)    it was also defective and unreasonably dangerous in that the device failed to perform as safely as an ordinary consumer would expect or was dangerous to an extent beyond which could be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

(i)    the ordinary consumer would not contemplate that the Device would fail and that premature revision surgery would become necessary less than two (2) years after implantation; and

(ii)    the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the Device releasing harmful metal ions and metal debris in the consumer's body that caused medical complications.

22

77.    The Device was not tested in design and development under conditions that were known would be encountered in the normal in vivo patient environment over reasonable periods of time.

78.    The Device was not tested in design and development under the normal in vivo patient environmental conditions that were known would be encountered during normal use of the Device.

79.    The Device was not tested for the FDA Section 510(k) Premarket Notification Process under conditions that were known would be encountered in the normal in vivo patient environment.

80.    The testing performed by Wright and MicroPort of the Device did not adhere to or meet FDA guidance.

81.    The Device's design was known by Defendants to be failing from fretting and corrosion of the modular Neck-Stem junction prior to the day of its FDA 510(k) Premarket Notification Application.

82.    The Device was known by Defendants to be failing at higher than expected rates from micromotion, fretting and corrosion of the modular neck-stem junction prior to the date of its implantation in Plaintiff during the Index Surgery.

83.    The Device's design was known by Defendants to be failing at higher than expected rates due to fretting and corrosion prior to the date of Plaintiff's Revision Surgery.

23

84.     Prior to the Index Surgery, Defendants did not warn patients, surgeons, customers, or their sales representatives/distributors that the Device was known to be failing from corrosion at higher than expected rates.

85.     Plaintiff's Devices failed as a result of one or more or a combination of the foregoing unreasonably dangerous conditions.

86.     As a direct and proximate result of the failure of the Profemur® Total Hip System, Plaintiff has sustained injuries and damages, including, but not limited to:

(a)     undergoing surgery to remove and replace the head and neck of the failed device and repair the damage the failure caused;

(b)     past and future pain, suffering, and anguish, both in mind and in body;

(c)     permanent diminishment of her ability to participate in and enjoy the affairs of life;

(d)     medical bills associated with the revision surgery and rehabilitation and recovery therefrom;

(e)     future medical expenses;

(f)     disfigurement;

(g)     physical impairment; and

24

(h)    physical injuries to bone, muscle, tendons, tissues and nerves in her hip and pelvis.

## FEDERAL STATUTORY AND REGULATORY REQUIREMENTS

87.    Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. 21 U.S.C. § 351.

88.    Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. 21 U.S.C. § 352.

89.    Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices. In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury. Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or

removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health. 21 U.S.C. § 360(i).

90.    Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device, but not including an evaluation of the safety or effectiveness of a device), packaging, storage and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law.

91.    The regulations requiring conformance to good manufacturing practices are set forth in 21 C.F.R. § 820, *et seq.*  As explained in the Federal Register, because the Current Good Manufacturing Practice ("CGMP") regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device.  Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured and the manufacturing processes employed.  Manufacturers must adopt current and effective methods and procedures for each device they design and

manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

92.     Pursuant to 21 C.F.R. § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Drug & Cosmetic Act ("the Act"). 21 U.S.C. § 351.

93.     Pursuant to 21 C.F.R. § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. 21 C.F.R. § 820.3(v).

94.     Pursuant to 21 C.F.R. § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

95.     Pursuant to 21 C.F.R. § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

96.     Pursuant to 21 C.F.R. § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

27

97.    Pursuant to 21 C.F.R. § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

98.    Pursuant to 21 C.F.R. § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

99.    Pursuant to 21 C.F.R. § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design.  Design validation shall be performed under defined operating conditions on initial production units, lots or batches, or their equivalents.  Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

100.    Pursuant to 21 C.F.R. § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

101.    Pursuant to 21 C.F.R. § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review and approval of design changes before their implementation.

28

102.    Pursuant to 21 C.F.R. § 820.70(a), each manufacturer shall develop, conduct, control and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.  Such process controls shall include:

(a)    documented instructions, standard operating procedures ("SOPs") and methods that define and control the manner of production;

(b)    monitoring and control of process parameters and component and device characteristics during production;

(c)    compliance with specified reference standards or codes;

(d)    the approval of processes and process equipment; and

(e)    criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

103.    Pursuant to 21 C.F.R. § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure.

104.    Pursuant to 21 C.F.R. § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could

reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

105.    Pursuant to 21 C.F.R. § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

106.    Pursuant to 21 C.F.R. § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning, and use.

107.    Pursuant to 21 C.F.R. § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

108.    Pursuant to 21 C.F.R. § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

109.    Pursuant to 21 C.F.R. § 820.72, each manufacturer shall ensure that all inspection, measuring and test equipment, including mechanical, automated or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results.  Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked and maintained.

110.    Pursuant to 21 C.F.R. § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. *See* 21 C.F.R. § 820.3(z)(1).

111.    Pursuant to 21 C.F.R. § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualified individuals.

112.    Pursuant to 21 C.F.R. § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

31

113.    Pursuant to 21 C.F.R. § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action.    The procedures shall include requirements for:

(a)    analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems;

(b)    investigating the cause of nonconformities relating to product, processes and the quality system;

(c)    identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(d)    verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

(e)    implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(f)    ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(g)    submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

114.    Upon information and belief, the Profemur® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because, among other things, it failed to meet established performance standards and/or the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

115.    Upon information and belief, the Profemur® Total Hip System is misbranded because, among other things, it is dangerous to health when used in the manner prescribed, recommended, or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

116.    Upon information and belief, the Profemur® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because Wright and MicroPort failed to establish and maintain CGMP for the Profemur® Total Hip System, including components, in accordance with 21 C.F.R. § 820, *et seq.*, as set forth above.

117.    Upon information and belief, Wright and MicroPort failed to establish and maintain CGMP with respect to the quality audits, quality testing and process validation for the Profemur® Total Hip System, including its components.

118. As a result of Wright's and MicroPort's failure to establish and maintain CGMP as set forth above, the Profemur® Total Hip System was defective and failed, resulting in injuries and damages to Plaintiff.

119. If Wright and MicroPort had complied with the federal requirements regarding CGMP, the Profemur® Total Hip System would have been manufactured and/or designed properly such that it would not have resulted in injuries to Plaintiff.

120. Plaintiff's injuries and damages were both factually and proximately caused by the defective Profemur® Total Hip System.

121. Plaintiff's injuries were both factually and proximately caused by the unreasonably dangerous Profemur® Total Hip System.

122. Plaintiff further shows that she is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering for all pain and suffering that she has incurred as a result of the defective product, the follow-up surgeries, rehabilitation, and constant pain that occurs as a result of the failure of the Device.

## FIRST CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### (As to all Defendants)

123. Plaintiffs incorporate by reference the factual allegations set forth above.

124.   At all times relevant hereto, Defendants Wright and MicroPort designed, tested manufactured, distributed, sold, marketed and/or promoted the Profemur® Total Hip System, for implantation into consumer-patients, such as Plaintiff, by orthopedic surgeons in the United States, including Florida.

125.   Defendants had a duty to distribute, market, and/or sell the Profemur® Total Hip System with a design that did not present an unreasonable risk of harm or injury to users and Patients exposed to its danger including Plaintiff.

126.   At all times relevant hereto, the Profemur® Total Hip System, including the component parts, was expected to, and did, reach prescribing physicians and consumers, including Plaintiff and Plaintiff's physicians, without a substantial change in the condition in which it was sold.

127.   The design defects in the Profemur® Total Hip System existed when the device left Defendants' control.

128.   At all times relevant hereto, Plaintiff and Plaintiff's healthcare providers used the Profemur® Total Hip System for its intended or reasonably foreseeable purpose.

129.   Plaintiff's physicians implanted the Profemur® Total Hip System, including its components, in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendants.

130.  At all times relevant hereto, the Profemur® Total Hip System's design was defective and unreasonably dangerous.  Such defects included, but were not limited to, a tendency to (a) generate dangerous and harmful metal debris in the patient's body; (b) corrode; (c) cause pain; (d) inhibit mobility; (e) require revision surgery; and (f) fracture.

131.  Plaintiff thereupon alleges that the Profemur® Total Hip System implanted in Plaintiff is defective and unreasonably dangerous because it was defectively designed, as aforesaid, and, as a result, failed to perform as safely as an ordinary consumer would expect when the product is used in a reasonably foreseeable manner.

132.  The Profemur® Total Hip System as designed carried risks that were outweighed by any utility of the design of the device.

133.  The Profemur® Total Hip System was defective in design and unreasonably dangerous when it entered the stream of commerce  and was received by Plaintiff and/or her physicians, because the foreseeable risks exceeded or outweighed the purported benefits associated with the device.

134.  Plaintiff and Plaintiff's healthcare providers could not have discovered any defect in the Profemur® Total Hip System through the exercise of due care.

36

135.    Feasible safer alternative designs providing the same functional purpose were available to the Defendants at the time the Profemur® Total Hip System was designed and offered for sale in the market.

136.    As a direct, legal, proximate and producing result of the defective design of the Profemur® Total Hip System implanted in Plaintiff, Plaintiff sustained injuries and damages as set forth above, for which the Defendants are strictly liable.

137.    The dangerous, unsafe, and defective design of the Profemur® Total Hip System implanted in Plaintiff was a substantial factor in causing Plaintiff's injuries and damages as set forth above, for which the Defendants are strictly liable.

## SECOND CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (As to All Defendants)

138.    Plaintiffs incorporate by reference the factual allegations set forth above.

139.    The Profemur® Total Hip System was defective and unreasonably dangerous when it left the possession of Defendants in that it failed to provide adequate warnings to alert the medical community and patients, including Plaintiff and Plaintiff's healthcare providers, to the dangerous risks associated with the Profemur® Total Hip System when used for its intended and reasonable foreseeable purpose. The dangers and risks included, but were not limited to, a tendency to (a)

generate dangerous and harmful metal debris in the patient's body; (b) cause injury and pain; (c) inhibit mobility; (d) require revision surgeries; and (e) fracture.

140.  At all times relevant hereto, Plaintiff and Plaintiff's healthcare providers used the Profemur® Total Hip System for its intended or reasonably foreseeable purpose.

141.  Defendants had superior knowledge to Plaintiff and Plaintiff's healthcare providers concerning the unreasonably dangerous nature of the product's design and Plaintiff and Plaintiff's healthcare providers could not have discovered any defect in the Profemur® Total Hip System through the exercise of due care.

142.  Defendants knew or should have known, through complaint data and knowledge of the product's design history, by the use of generally recognized and prevailing scientific/ technical/ medical knowledge available at the time of the product's distribution, that a foreseeable use of the product may be unreasonably dangerous without adequate warnings of the danger(s) posed and potential risks and side effects associated with the Profemur® Total Hip System.  Defendants knew or should have known of the defective design, condition, characteristics, and risks associated with the Device as previously set forth herein.

143.  The warnings and instructions provided with the Profemur® Total Hip System by Defendants did not adequately warn of the potential risks and side effects

of the Profemur® Total Hip System, which risks were known or scientifically knowable to Defendants.

144.   Defendants had a continuing duty to warn the medical community and public, including Plaintiff and Plaintiff's healthcare providers, of the potential risks and increased failure rate associated with the Profemur® Total Hip System.

145.   As a direct, legal, proximate and producing result of Defendants' failure to warn, Plaintiff sustained the injuries and damages as set forth above, for which the Defendants are strictly liable.

146.   Defendants' failure to adequately warn of the potential risks and side effects of the Profemur® Total Hip System was a substantial factor in causing Plaintiff's injuries and damages as set forth above, for which the Defendants are strictly liable.

## THIRD CAUSE OF ACTION

### NEGLIGENCE
### (As to All Defendants)

147.   Plaintiffs incorporate by reference the factual allegations set forth above.

148.   At all times relevant hereto, Defendants designed, manufactured, distributed, sold, marketed and/or promoted the Profemur® Total Hip System for implantation into consumer-patients, such as Plaintiff, by physicians and surgeons in the U.S.

39

149.   Prior to, on, and after the date of Plaintiff's index surgery, and at all times relevant hereto, Defendants had a duty to exercise reasonable care in the design, manufacture, testing, marketing, distribution, warning, sale, and post-market surveillance of the Profemur® Total Hip System.

150.   Prior to, on, and after the date of Plaintiff's index surgery, and at all times relevant hereto, Defendants breached this duty and failed to exercise reasonable care and were careless in the design, manufacture, testing, marketing, distribution, warning, sale, and post-market surveillance of the Profemur® Total Hip System.

151.   At all relevant times, the Defendants had actual knowledge, or should have known through the exercise of reasonable and prudent care, of the defects, hazards, dangers and risks associated with the Profemur® Total Hip System.

152.   Prior to, on, and after the date of Plaintiff's index surgery, and all times relevant hereto, Defendants knew or should have known that the history and novel design of the Profemur® Total Hip System necessitated clinical trials and other pre-marketing evaluations of risk and efficacy.  Such testing would have revealed the increased risk of failure and complications associated with the Profemur® Total Hip System.  A reasonable manufacturer under the same or similar circumstances would have conducted additional testing and evaluation of the Profemur® Total Hip

40

System's safety and performance prior to placing the Profemur® Total Hip System into the stream of commerce.

153.    Prior to, on, and after the date of Plaintiff's index surgery, and all times relevant hereto, Defendants knew or should have known of the serious complications and high failure rate associated with the Profemur® Total Hip System.  Despite receiving hundreds of reports of serious complications from healthcare providers, Defendants chose (1) not to discontinue or redesign the Device; (2) not to perform any additional testing of the Profemur® Total Hip System; (3) not investigate other potential causes of the reported complications; (4) suspend sales or distribution; or (5) warn physicians and patients of the propensity of  the Profemur® Total Hip System to generate dangerous and harmful metal debris in the patient's body; cause pain; inhibit mobility; fracture; and require revision surgery.

154.    Defendant's knew and/or should have known that it was foreseeable that consumer-patients such as Plaintiff would suffer injuries and damages as a result of Defendants' failure to exercise reasonable and prudent care as set forth above.

155.    As a direct, legal, proximate and producing result of the Defendants' negligent designing, testing, manufacturing, marketing, selling, distribution, warning, post-market surveillance, and promotion of the Profemur® Total Hip System, Plaintiff sustained injuries as set forth above.

156. Defendants' negligent design, warning, labeling, testing, manufacturing, marketing, selling, distributing, post-market surveillance, and promoting of the Profemur® Total Hip System implanted in Plaintiff was a substantial factor in Plaintiff's injuries and damages as set forth above.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE – FAILURE TO RECALL/RETROFIT
### (As to all Defendants)

157. Plaintiffs incorporate by reference the factual allegations set forth above.

158. At all times relevant hereto, Defendants Wright and MicroPort knew or should have known that the design of the Profemur® Total Hip System and its warnings were dangerous or were likely to be dangerous when used in an intended or reasonably foreseeable manner.

159. Despite the severity and number of complaints Defendants Wright and MicroPort received, Defendants failed to recall, retrofit or warn patients or physicians about the danger of the Profemur® Total Hip System.

160. As a direct, legal, proximate and producing result of the Defendants' failure to recall the Profemur® Total Hip System, Plaintiff suffered injuries and damages as set forth above.

42

161. Defendants' failure to recall the Profemur® Total Hip System implanted in Plaintiff was a substantial factor in Plaintiff's injuries and damages as set forth above.

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
### (As to All Defendants)

162. Plaintiffs incorporate by reference the factual allegations set forth above.

163. Defendants had a duty to truthfully represent to the medical community, and to Plaintiff, Plaintiff's healthcare providers and the FDA, that the Profemur® Total Hip System had not been properly tested and not found to be safe and effective for its intended use.

164. Defendants knew or should have known that their representations that the Device was safe and effective were false and the representations regarding the safety and performance of the Profemur® Total Hip System was in fact, false.

165. Defendants failed to exercise ordinary care in determining the truth or falsity of their representations, and by misrepresenting the safety and performance of the Profemur® Total Hip System.

166. Defendants breached their duty to present truthful representations by knowingly, or by want of ordinary care, misrepresenting the safety and performance of the Profemur® Total Hip System.

43

167.   As a direct, legal, proximate and producing result of Defendants' concealment of material facts, Plaintiff has suffered injuries as set forth herein.

## SIXTH CAUSE OF ACTION

### FRAUD BY CONCEALMENT
### (As to All Defendants)

168.   Plaintiffs incorporate by reference the factual allegations set for above.

169.   Wright and MicroPort, as manufacturers of the Profemur® Total Hip System, were armed with superior knowledge of the latent dangers associated with the Device (e.g., corrosion, loosening, metallosis, fretting) and had a duty to communicate these dangers to Plaintiff and Plaintiff's healthcare providers.

170.   Defendants had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public that the Wright Medical Profemur Total Hip System had not been adequately tested and found to be safe and effective for the treatment of patients requiring a hip replacement.  Instead, the Defendants knew, but deliberately failed to communicate this to Plaintiff or Plaintiff's surgeons.

171.   Defendants had a duty to inform, but fraudulently concealed from the medical community, implanting orthopedic surgeons, Plaintiff, and the public that the components of the Wright Medical Profemur Total Hip System had an unreasonable and dangerous risk of corroding, fretting, and causing bodily injury.

172.   Through the reporting of adverse events to Wright and MicroPort, and by reports from experts in metallurgy and biomechanics retained by Wright and

44

MicroPort, Defendants knew of the risk of corrosion and subsequent adverse tissue reaction and resulting bodily injury present in the device implanted in Plaintiff but did not disclose this information. Neither Plaintiff nor Plaintiff's surgeons had this information, nor could they have discovered this information through reasonable diligence.

173. The Defendants had a duty to communicate the increased risk and known failures associated with the device implanted in Plaintiff to Plaintiff and Plaintiff's surgeons.

174. Plaintiff and Plaintiff's surgeons justifiably relied upon Defendants to communicate known risks and failures when making both the decision to implant Defendants' modular hip replacement device and the appropriate course of treatment following Plaintiff's index surgery.

175. Had Defendants accurately and truthfully represented to the medical community, Plaintiff, Plaintiff's surgeons, and the public the material facts that it knew regarding the risks of the Profemur Total Hip System, Plaintiff and/or Plaintiff's healthcare provider(s) would not have utilized Defendants' Profemur Total Hip System.

176. Had Defendants not fraudulently concealed the increased risk of corrosion, effects of corrosion, and the known failures of the device from Plaintiff or Plaintiff's surgeons, Plaintiff's injuries would have been avoided or limited.

177.  As a direct, legal, proximate, and producing result of Defendants' fraudulent concealment, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## SEVENTH CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

178.  Plaintiffs incorporate by reference the factual allegations set forth above.

179.  Defendants, as manufacturers and distributors of the Profemur® Total Hip System armed with superior knowledge regarding the latent defects and failure rates associated with the Device, had a duty to accurately and truthfully represent to the public, the medical community, Plaintiff, and Plaintiff's surgeons, the material facts that it knew regarding the risks Profemur® Total Hip System.

180.  Defendants made false representations of material fact to Plaintiff and/or her healthcare providers as to the safety and efficacy of the Profemur Total Hip System.  Instead of disclosing the heightened risks of corrosion, fretting, fracture, metallosis, failure, and permanent injury, Defendants represented:

46

a) that there was no indication of an increased risk of adverse events due to taper junction fretting and corrosion,

b) that lab testing guaranteed structural reliability and the absence of significant micromovement and absence of fretting corrosion;

c) that product complaint data did not indicate an increased risk of corrosion for Profemur CoCr modular necks when coupled with Profemur titanium hip stems;

d) that, "[u]tilized in both primary and revision applications, the current [Profemur modular] neck design has been successfully employed to improve surgical outcomes with no reported failures";

e) that Profemur® CoCr modular necks would result in less fretting than occurred with titanium modular necks;

f) that Profemur® cobalt-chromium modular necks coupled with Profemur® stems showed a total absence of corrosion in an in vivo environment; and

g) that the Profemur Total Hip System, including its component parts, were safe and effective, and were safer and more effective than other treatments for hip replacements.

181. Defendants knew that the above representations alleged were false, yet Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in these representations.

182. Defendants made these false representations with the intent of defrauding and deceiving the medical community, Plaintiff, and the public, and to induce the medical community, Plaintiff's implanting surgeons, Plaintiff, and the public to utilize the Profemur CoCr modular neck coupled with the Profemur titanium modular stem as part of the Profemur Total Hip System. Doing so constituted a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff and the public.

183. Plaintiff and her healthcare providers justifiably relied upon Defendants' false representations of material fact in deciding to utilize the Profemur Total Hip System, including the CoCr modular neck and titanium modular stem.

184. Had Plaintiff or her healthcare providers known the true facts about the dangers and health risks of the Profemur CoCr modular neck coupled with the Profemur titanium modular stem as components of the Profemur Total Hip System, they would not have utilized these products.

185. As a direct, legal, proximate, and producing result of Defendants' fraudulent conduct, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and

will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## EIGHTH CAUSE OF ACTION

### LOSS OF CONSORTIUM
### (Against All Defendants)

186.   Plaintiffs incorporate by reference the factual allegations set forth above.

187.   At all relevant times, Plaintiff Victor Popowicz was and is the lawfully wedded husband of Plaintiff Kim Popowicz and as such, was and is entitled to the services, consortium and society of Kim Popowicz.

188.   As a result of the foregoing, Plaintiff Victor Popowicz was deprived of the services, consortium and society of Kim Popowicz.

189.   As a direct, legal, proximate, and producing consequence of Defendants' wrongful conduct as described herein, Plaintiff Victor Popowicz has suffered and will continue to suffer the loss of support, companionship, service, love, affection, society, intimate relations and other elements of consortium all to the detriment of their marital relationship for which Plaintiff Victor Popowicz is entitled to compensatory and equitable damages in an amount to be proven at trial.

## DAMAGES INCLUDING PUNITIVE DAMAGES
### (Against All Defendants)

190.   Plaintiffs incorporate by reference the factual allegations set forth above.

191.   Defendants for many years prior to Plaintiff's index surgery, knew or should have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury or damage to Plaintiff (and other patients) yet the Defendants continued their conduct intentionally,  willfully, wantonly, and with fraud and/or malice. Defendants also made representations and/or concealed information in a fraudulent manner.  Furthermore, Defendant's greatly profited from their misconduct as set forth above.

192.   Additionally, Defendants had actual knowledge of the wrongfulness of their conduct as set forth above and the high probability that injury or damage to Plaintiff would result and, despite that knowledge intentionally pursued that course of conduct resulting in injury or damage to Plaintiff.  Further, Defendants' conduct was so reckless or wanting in care that it constitutes gross negligence, that is Defendants acted with a conscious disregard or indifference to the life, safety or rights of persons, including Plaintiff, exposed to such conduct.  Plaintiff, therefore, is entitled to an award of punitive damages (Florida Statute Sec. 768.72(2)(a)(b) and (3)).

193.    Additionally, as a direct, legal, proximate, and producing result of the acts and omissions of the Defendants alleged herein, Plaintiff was injured and damaged. The injuries and damages for which Plaintiff seeks compensation from Defendants include, but are not limited to:

(a)    physical pain and suffering of a past, present and future nature;

(b)    emotional pain and suffering of a past, present and future nature;

(c)    permanent impairment and scarring;

(d)    medical bills and expenses of a past, present and future nature;

(e)    loss of enjoyment of life;

(f)    pre- and post-judgment interest;

(g)    statutory and discretionary costs;

(h)    punitive damages; and

(i)    any and all such other and further legal and equitable relief as the Court deems necessary, just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    For general damages, including past, current, and future pain and suffering, for personal injuries to Plaintiff according to proof;

2.      For all past, current, and future medical and incidental expenses, according to proof;

3.      For punitive and/or exemplary damages in an amount sufficient to punish Defendants and deter similar conduct in the future, according to proof;

4.      For damages for loss of consortium, according to proof;

5.      For pre-judgment interest, as provided by law;

6.      For reasonable attorney's fees;

7.      For costs of litigation; and

8.      For such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

Dated: March 20, 2023.

Respectfully submitted,

N. Kirkland Pope
GA Bar No. 584255
POPE McGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, GA  30326
Ph: 404-523-7706
Fx: 404-524-1648
efile@pmkm.com

*Attorney for Plaintiffs*